IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| OPTICSPLANET INC.,<br><br>PLAINTIFF,<br><br>v.<br><br>POWERUP, INC., a Michigan corporation d/b/a PBTT, ALEXANDER DERDERIAN, DAVID HANOUTE, TONY MAINPRIZE, GREGORY DERDERIAN,<br><br>DEFENDANTS. | ) | Case No. 25-cv-2623 |

**AMENDED COMPLAINT**

Now comes the Plaintiff. OpticsPlanet, Inc. an Illinois Corporation, by and through its attorneys Netzky Olswang Hanlon, LLC and complains of the Defendants POWER UP INC., a Michigan corporation d/b/a PBTT, ALEXANDER DERDERIAN, DAVID HANOUTE, DAVID HANOUTE, AND TONY MAINPRIZE, and states as Follows:

**Parties**

1) The Plaintiff, OpticsPlanet, Inc. is an Illinois Corporation doing business at 3150 Commercial Ave. Northbrook, Illinois 60062.

2) Defendant "POWER UP Inc. doing business as PBTT" has its headquarters at 9393 Oakmont Drive, Gand Blanc, Michigan 48439.

3) Defendant, ALEXANDER DERDERIAN, holds himself out to be the President of POWER UP Inc., and is a citizen of Michigan with his address at 9393 Oakmont Dr. Grand Blanc, Michigan 48439. Alexander Derderian was at all times relevant to this cause a director of POWER UP, INC.

4) Defendant, DAVID HANOUTE, holds himself out to be treasurer of POWER UP Inc., and is a citizen of Michigan residing at 10306 Jewell Lake Ct., Fenton Michigan 48430. DAVID HANOUTE was at all times relevant to this cause a director of POWER UP INC.

5) Defendant, TONY MAINPRIZE, holds himself out to be the Corporate Secretary of POWER UP, INC. and is a citizen of Michigan residing at 126 E. GRAND BLANC RD. GRAND BLANC, MI 48439. TONY MAINPRIZE was at all times relevant to this cause a director of POWER UP INC.

6) Defendant, GREGORY DERDERIAN, is a Citizen of the State of Michigan and holds himself out to be a director of Power-Up Inc. GREGORY DERDERIAN was at all times relevant to this cause, a director of POWER UP INC.

**Jurisdiction and Venue**

7) This Court has jurisdiction pursuant to 28 U.S.C. 1331 because this complaint raises federal questions associated with the Lanham Act 15 U.S.C. §§ 1051 et seq. This Court also has Diversity Jurisdiction pursuant to 28 U.S.C. 1332(a) because there is complete diversity of parties and the amount in controversy is in excess of $75,000. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. S1367.

8) Venue is proper in this district pursuant to 28 U.S.C. "1391(a) and (c). Many of the acts and transactions giving rise to the violations of law complained of herein occurred in this district.

9) In connection with the acts and conduct complained of, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and interstate telephone communications to further this fraudulent course of conduct.

**Short Statement of the Case**

10) On or about 10/14/20 Plaintiff began doing business with Power Up Inc. DBA PBTT, a manufacturer of goods sold under a logo bearing the name MAGNITE. In the parties' written

contract, Defendant POWER UP, INC represented that it was owner of the intellectual property associated with the subject matter of its products and licensed Plaintiff to its trademarks and intellectual property known as "TRYBE and associated logos". Amongst its logos was "MAGNITE" which was not a registered mark at that time. Plaintiff, an online retailer/re-seller of goods, thereafter marketed and sold the products manufactured by Defendant. Between October of 2020 and the present, Plaintiff on 38 separate occasions ordered goods from defendant. In March of 2023, the State of Michigan dissolved Power UP INC. No notice was provided to Plaintiff by any of the defendants that POWER UP INC was dissolved and by all outward measures Power Up appeared to continue in its corporate existence. On or about April 30, 2024, a trademark registration for MAGNITE was issued to "PBTT, a Michigan Corporation" which did not exist at that time and still does not exist. PBTT had been a DBA for POWER UP, INC. After POWER-UP, INC sold Plaintiff Genuine goods labeled with the MAGNITE logo under the parties' contract, Defendant, ALEXANDER DERDERIAN, issued a cease-and-desist letter to Plaintiff demanding Plaintiff no longer market the goods manufactured under the MAGNITE name, asserting that PBTT had all right and title to the MAGNITE goods. In the absence of the ability to continue under the parties' contract and course of dealing, Plaintiff will suffer direct financial losses of approximately $700,000 in inventory it would not be able to sell if it complied with the Demands of Mr. ALEXANDER DERDERIAN. The failure to fulfill its orders will cause not only a loss of the inventory but will also cause Plaintiff to suffer an injury to its reputation for failing to deliver goods promptly. This complaint has two counts. A count for Breach of Contract and a count seeking Declaratory and Injunctive Relief.

## Allegations Common to All Counts

11) The parties entered into a contract on October 14, 2020, whereby the Plaintiff agreed to purchase certain products manufactured by the Defendant for sale by Plaintiff. A copy of said contract is attached hereto and made a part hereof and marked as "Exhibit A".

12) In said contract the Defendant maintains that it is an Indiana Corporation. Review of the Indiana Secretary of State records reveals that Defendant Power Up, Inc., DBA PBTT was, in fact, a Michigan Corporation previously registered as a foreign corporation registered to do business in Indiana.

13) Defendant, Power Up, Inc., is not registered to do business in Illinois and has not been registered to do business in Illinois.

14) On March 30, 2023, Defendant Power Up, Inc., was dissolved by the State of Michigan. Each of the other named defendants exercise control over what was Power Up Inc.

15) The defendant represented that it was the owner of all trademarks and intellectual property of goods sold to plaintiff, including, but not limited to, the trademarks TRYBE and associated logos, including and specifically MAGNITE. (Exhibit A paragraph 4)

16) The agreement provides that it should be governed by the laws of the State of Illinois. (Exhibit A paragraph 15)

17) On or about April 30, 2024, the individual Defendants obtained a trademark registration for MAGNITE under the name of "PBTT Inc." purportedly a Michigan corporation. However, according to the Corporations Division of the State of Michigan, "PBTT, Inc." is not a Michigan corporation. Thus, the Mark's registration is not valid as there was no Michigan corporation in existence to have obtained the Trademark issued by the U.S. Patent and Trademark office.

18) Following the execution of the agreement, Plaintiff, an online retailer, purchased products manufactured by Defendant bearing the MAGNITE mark exceeding $1,575,000.

19) The goods acquired by Plaintiff bearing its trademark MAGNITE are unaltered and genuine and sold in the unaltered form as delivered by Defendants.

20) The contract provides that the agreement will automatically renew for 1-year terms on the anniversary date unless either party provides written notice of nonrenewal 60 days prior to the expiration of the current term. (Exhibit A paragraph 6).

21) Neither party to the agreement exercised the non-renewal option prior to the anniversary date of 10/14/24.

22) Defendant failed to provide 60 days' written notice prior to the October 14th renewal date of an intent to cancel the contract, thus breaching the explicit terms of the agreement.

23) On March 4, 2025, the Defendant provided written notice to Plaintiff that effective March 3, 2025, that it was to discontinue all use of the trademark addressed in the contract attached as "Exhibit A". Said letter is attached hereto and made a part hereof and marked as "Exhibit B".

24) Plaintiff has fully performed all of its obligations under the contract.

25) The contract explicitly provides that the Plaintiff shall have the right to sell all remaining stock of products in Plaintiff's possession following termination of the agreement. (Ex A, #6).

26) Since the formation of the parties contract, Plaintiff has ordered over $1,700,000 of defendants goods with the MAGNITE logo and paid for over $1,575,000 for goods actually delivered with said logo.

27) At this time, Plaintiff has in its possession $700,000 in goods with the MAGNITE logo covered by the contract attached in Exhibit A.

28) The Defendant's demand for immediate termination of the contract is a breach of the terms of the original agreement or reasonably creates the anticipation of breach by Defendants.

29) ALEXANDER DERDERIAN's demand has resulted in the Plaintiff being damaged by being unable to sell or distribute approximately $700,000 in products in Plaintiff's possession.

Furthermore, Plaintiff's reputation has been harmed due to an inability to fulfill its obligations and orders.

30) Defendants, ALEXANDER DERDERIAN, DAVID HANOUTE, DAVID HANOUTE, AND TONY MAINPRIZE, and GREGORY DERDERIAN continue to operate PowerUp, Inc. dba PBTT without any corporate formality.

31) Defendants, ALEXANDER DERDERIAN, DAVID HANOUTE, DAVID HANOUTE, TONY MAINPRIZE, and GREGORY DERDERIAN, disregarded all corporate formalities and treated the Power UP Inc. as a conduit for their own personal business, thus necessitating the imposition of personal liability to avoid injustice.

32) Paragraph 5 of the Contract allows for the recovery of attorney fees and costs in its indemnification paragraph.

33) The Plaintiff has no adequate remedy at law should its business reputation be harmed in this manner.

34) Injunctive relief is necessary to preserve the status quo and allow the Plaintiff to dispose of its remaining MAGNITE product consistent with the terms of the Contract.

35) Plaintiff is likely to succeed on the merits of its Complaint as the contract at issue explicitly provides that it is permitted to sell all products remaining in its possession following termination of the Contract. (Ex. A #6) Moreover, plaintiff is likely to succeed on the merits under the "First Sale Doctrine".

36) The formation of the Contract between PowerUp, Inc and Plaintiff was completed in Illinois on 10/15/2020. See Contract document page 5.

**COUNT I**
**Breach of Contract**

37) Plaintiff restates paragraphs 1-36 as if fully set forth in this Count I.

38) Plaintiff and defendant, PowerUp Inc., came to a mutual agreement coupled with consideration for the sale of goods in excess of $500. The mutual manifestation of assent to the parties' agreement is memorialized in that contract agreement attached hereto and incorporated herein as Exhibit A.

39) The contract provided for economic consideration for its terms.

40) Defendant breached the Agreement when defendant issued a cease and desist letter that was directly against the express terms of the written agreement shown in Exhibit A.

41) Plaintiff has suffered an injury as a result of the breach by the Defendant and also suffers irreparable injury to its reputation because the breach of contract exposes Plaintiff to reputational loss for not being able to meet the orders of its customers.

Wherefore, the Plaintiff OPTICSPLANET, Inc. prays that this Honorable court grant the following relief

A) Enter Judgment in its favor and against each of the defendants in the amount of $700,000 plus any and all further relief as the Court deems appropriate.

B) Order Defendant's specific performance of the Agreement on a temporary basis and permanent basis to allow Plaintiff to liquidate the goods purchased from Defendants until such time as Plaintiff has liquidated all of its product bearing the MAGNITE logo.

C) Grant Plaintiff a Temporary Restraining order preventing Defendant from undertaking any action to prevent Plaintiff from selling its merchandise having the MAGNITE logo.

D) Grant Plaintiff a Preliminary Injunction and permanent injunction preventing Defendant from undertaking any action to prevent Plaintiff from selling its merchandise having the MAGNITE logo.

E) Award Plaintiff its reasonable attorney fees and costs pursuant ot paragraph 5b of the Contract document.

F) For such other and further relief as this Court deems just and equitable.

**COUNT 2**
**Declaratory Judgment Plead in the Alternative to Count I**

27) Plaintiff restates and incorporates by reference the allegations contained in Count 1 as though fully set forth herein.

28) There is an actual controversy between the parties to this action in which Plaintiff requires direction form this Court as to how to proceed, which is of such sufficient immediacy and reality to warrant the issuance of declaratory and injunctive relief.

29) The "First Sale Doctrine" is a long established black letter doctrine of Trademark law applicable in this case. That doctrine prohibits Defendants efforts to prevent the re-sale of the genuine goods. See *Maui Jim v. Smartbuy Guru Enters.*, 459 F. Supp. 3d 1058; *Std. Process, Inc. v. Total Health Disc., Inc.*, 559 F. Supp. 2d 932.

30) Of the remaining inventory, all of the goods acquired by Plaintiff from Defendants all are "Genuine Goods". Plaintiff has not materially altered or repackaged the MAGNITE goods it purchased from Defendants.

31) Plaintiff is in immediate danger of suffering a direct injury as a result of the defendants' conduct in attempting to divest Plaintiff of its rights to sell the merchandise it has acquired at great expense.

32) On or about March 4, 2025, the defendant PBTT directed the Plaintiff to stop the use and distribution of products bearing trademarks purportedly owned by PBTT. (See Exhibit B attached hereto and made a part hereof)

33) At the time that Plaintiff received said demand it was in possession of approximately $700,000 worth of products bearing the relevant trademarks that had been previously purchased and paid for from Defendant.

34) The contract attached as Exhibit A provides that if either party wishes to cancel the contract, they must give 60 days' written notice before the renewal date of October 14th. Otherwise, the contract automatically renews for one year. (Ex A #6)

35) Prior to March 4th, 2025, neither party had given written notice of an intent to cancel the agreement.

36) The contract explicitly provides that the plaintiff shall have the right to sell all remaining stock of products in its possession following the cancellation of the contract. (#6)

37) PBTT has threatened Plaintiff with legal action if it does not immediately discontinue sales of the products in question including orders in process and remove all references to same from Plaintiff's websites. (Exhibit C)

38) Compliance with Defendants' demands would prohibit Plaintiff from fulfilling existing orders and that would cause irreparable harm to Plaintiff's business reputation.

39) The Plaintiff has no adequate remedy at law to compensate it for such harm to its business reputation.

40) An actual controversy exists between the parties as the Defendant's demands are contrary to the plain language of the contract regarding the disposal of the remaining products in Plaintiff's possession.

41) The Plaintiff brings this action to determine that the provision to sell and distribute the remaining products in its possession is enforceable and Defendant must honor same.

Wherefore, Plaintiff, OpticsPlanet, Inc. an Illinois Corporation, by and through its attorneys Netzky Olswang & Hanlon, LLC, asks this Honorable court to enter Judgment in its favor and against

the Defendant Power Up Inc. D/b/a PBTT Inc. a Michigan Corporation and the individual named defendants as follows:

1) Declare that the Trademark issued by the U.S. Patent and Trademark office for "MAGNITE" as registration number 7,374,878 is not valid.

2) Declare that the contract entered into between PowerUp Inc., DBA PBTT and Plaintiff permits the Plaintiff to sell and distribute the products in its possession that are covered by the underlying agreement including the future marketing and sale of all genuine goods with the MAGNITE logo.

3) Award Plaintiff its reasonable Attorney Fees and costs under the parties indemnity agreement.

## JURY DEMAND

Plaintiff demands trial by jury on all claims so triable.

Respectfully submitted:

*/s/Robert T. Hanlon*

ROBERT T. HANLON
One of Plaintiffs' Attorneys

Robert T. Hanlon
Netzky Olswang & Hanlon LLC
8605 West Bryn Mawr, Suite 309
Chicago, Illinois 60631
robert@nohlawchicago.com
robert@robhanlonlaw.com
312/622-7325

Exhibit A - the contract document
Exhibit B - the 3/4/25 cease and desist letter.
Exhibit C - the 3/4/25 email from Alex Derderian to Alex Royzen.

# EXHIBIT A

OPTICS PLANET INC

## MANUFACTURING CONTRACT

This Manufacturing and Supplier Agreement (the "Agreement") is entered into as of 10/14/2020 ________ (the "Effective Date"), by and between OpticsPlanet, Inc., an Illinois corporation with offices at 3150 Commercial Ave., Northbrook, Illinois 60062, U.S.A. and its affiliates ("OpticsPlanet") and [illegible] Inc. dba [illegible] a(n) Indiana Corporation ________ with offices at 5422 Vann Rd. Newburgh IN 47630 ("Manufacturer").

OpticsPlanet desires Manufacturer to be the manufacturer and supplier of certain products identified in Exhibit A and to manufacture the products to the specifications provided by OpticsPlanet (the "Products") and under the terms and conditions of this Agreement, for sale by OpticsPlanet under the trademarks and trade names owned by OpticsPlanet or its affiliates and identified on Exhibit B (the "Marks").

## AGREEMENT

Manufacturer agrees to the terms and conditions set forth below for manufacturing and supplying OpticsPlanet with the Products as specified herein, and both parties acknowledge and agree that there is adequate consideration for such arrangement. The parties agree:

**1. MANUFACTURE OF PRODUCTS:**

(a) Manufacturer shall manufacture and ship to OpticsPlanet the Products set forth in Exhibit A in accordance with manufacturing best practices prevailing in the industry and in strict compliance with the terms of this Agreement;

(b) OpticsPlanet and Manufacturer shall agree on quantity and delivery date and Manufacturer will schedule production and order materials accordingly;

(c) The Parties agree that proprietary products manufactured pursuant to this Agreement for OpticsPlanet will remain the exclusive property of OpticsPlanet. Manufacturer agrees to produce the Products identified in Exhibit A solely and exclusively for the OpticsPlanet.

**2. ORDERS:**

(a) The parties acknowledge that all Products will be ordered in the minimum quantities specified for each Product in Exhibit A by OpticsPlanet.

(b) OpticsPlanet may reject Products and is entitled to full refund or refusal to pay if the products do not fully comply with the agreed upon specifications or are not in compliance with the terms and conditions of this Agreement.

(c) Risk of damage or loss to Products shall remain with Manufacturer until the Products are received by OpticsPlanet.

**3. MARKS:**

(a) OpticsPlanet hereby grants Manufacturer a limited, non-exclusive, non-transferable license as to the Marks for the limited purpose of producing the Products subject this Agreement for OpticsPlanet's resale. Manufacturer grants OpticsPlanet a limited, nonexclusive right and license to Manufacturer's intellectual property, including, but not limited to, the patents, trademarks, copyrights, and intellectual property associated with any additional products

OPTICS PLANET INC.

ordered for the OpticsPlanet brand. OpticsPlanet and Manufacturer retain all right, title and interest in and to their respective intellectual property.

(b) Nothing herein is deemed to grant to Manufacturer any right or license to use the Marks for any purpose other than the labeling of Products for sale by OpticsPlanet as provided in this Agreement.

**4. REPRESENTATIONS AND WARRANTIES:**

(a) Manufacturer hereby represents to OpticsPlanet that:

(i) Manufacturer has the full legal right, power and authority to enter into this Agreement.

(ii) Manufacturer is the exclusive owner of any licensed intellectual property, that it has the right to grant the non-exclusive license described above, that it has not granted or agreed to grant any assignment, license, right or privilege which conflicts with the express provisions of this Agreement.

(iii) This Agreement is the legal, valid, and binding obligation of Manufacturer, enforceable against Manufacturer in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, or other similar laws of general application or by general principles of equity.

(iv) The signing and delivery of this Agreement by Manufacturer and the performance by Manufacturer of all of Manufacturer's obligations under this Agreement will not breach any agreement to which Manufacturer is a party, or give any person the right to accelerate any obligation of Manufacturer; violate any law, judgment, or order to which Manufacturer is subject; or require the consent, authorization, or approval of any person, including but not limited to any governmental body.

(b) OpticsPlanet hereby represents to Manufacturer that:

(i) OpticsPlanet has the full legal right, power and authority to enter into this Agreement.

(ii) OpticsPlanet is the exclusive owner of the Marks, that it has the right to grant the non-exclusive license described above, that it has not granted or agreed to grant any assignment, license, right or privilege which conflicts with the express provisions of this Agreement.

(iii) This Agreement is the legal, valid, and binding obligation of OpticsPlanet, enforceable against OpticsPlanet in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, or other similar laws of general application or by general principles of equity.

(iv) The signing and delivery of this Agreement by OpticsPlanet and the performance by OpticsPlanet of all of OpticsPlanet's obligations under this Agreement will not breach any agreement to which OpticsPlanet is a party, or give any person the right to accelerate any obligation of OpticsPlanet; violate any law, judgment, or order to which OpticsPlanet is subject; or require the consent, authorization, or approval of any person, including but not limited to, any governmental body.

OPTICS PLANET INC

**5. INDEMNIFICATION:** Manufacturer agrees to indemnify, hold harmless, and defend OpticsPlanet and its subsidiaries, affiliates, or any related companies, and their officers, directors, employees, agents, insurers, and representatives of any of them (each an "Indemnified Party" and collectively, the "Indemnified Parties") and each of the Indemnified Parties' successors and assigns (each of whom shall be an express third party beneficiary of such obligations), fully and to the fullest extent permitted by law, from and against any and all claims, losses, damages, expenses (including legal fees and expenses) and liabilities arising directly or indirectly from or by reason of any goods manufactured or supplied for OpticsPlanet under this Agreement or any goods or services supplied by Manufacturer that may be asserted or awarded against any Indemnified Party and to make payment corresponding to each such Indemnified Party's demand for any such reasonable fees, disbursements and other charges and legal and other expenses incurred with investigating or defending any of the foregoing, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) supplying any products that are the subject matter of this Agreement. Additionally, Manufacturer agrees to indemnify, hold harmless, and defend OpticsPlanet, and its Indemnified Parties from and against any and all claims, losses, damages, expenses (including reasonable attorneys' fees and expenses) and liabilities arising directly or indirectly from or by reason of the performance or supply by Manufacturer of any products that are the subject matter of this agreement and any claim by any third party that the goods or services infringe on any third parties' patent, copyright, trademark or other intellectual property rights that may be asserted or awarded against OpticsPlanet or indemnified parties. Further, Manufacturer agrees to comply with all applicable laws and regulations related to the products supplied, including, but not limited to, ensuring compliance with all packaging, testing, labeling, and advertising requirements. Manufacturer shall deliver products to OpticsPlanet in compliance with all applicable laws and regulations.

**6. TERM:** This Agreement shall run for a period of one (1) year from the date of execution, and renew automatically for one (1) year terms, unless either party provides written notice of non-renewal to the other party at least sixty (60) days prior to the expiration of the then-current term. OpticsPlanet may terminate this Agreement immediately:

(i) If Manufacturer fails to perform or meet any material term or condition hereof and has failed to correct same within 30 days after written notice of such failure by OpticsPlanet;

(ii) If Manufacturer or its agents or representatives, without OpticsPlanet's consent, has adulterated any Products;

(iii) If Manufacturer ceases to do business as a going concern or ceases to conduct its operations in the normal course of business, becomes insolvent, a receiver is appointed to the possession of all or substantially all of Manufacturer's property.

Following any termination OpticsPlanet shall have the right to sell all remaining stock of Products in OpticsPlanet's possession. Section 3, 4, 5, 7 and 8 shall survive termination of this Agreement.

OPTICS PLANET INC.

**7. INSURANCE:** Manufacturer agrees that at all times during its relationship with OpticsPlanet, it shall maintain general liability insurance acceptable to OpticsPlanet. Manufacturer shall provide evidence of its liability insurance and name OpticsPlanet as an additional insured per OpticsPlanet's requirements. Manufacturer shall immediately notify OpticsPlanet of any changes in coverage or insurer.

**8. CONFIDENTIALITY:** The attached Mutual Nondisclosure Agreement is incorporated by reference. All other terms and conditions of the Agreement shall remain in full force and effect. In the event of any conflict between the terms and conditions of this Agreement and the terms and conditions of the Attachment, this Agreement shall prevail.

**9. ENTIRE AGREEMENT:** This Agreement constitutes the entire understanding among the Parties and may only be modified by a written instrument signed by both Parties' authorized officers. This Agreement supersedes and replaces any prior proposals, communications, or agreements between the Parties concerning the subject matter hereof.

**10. INDEPENDENT CONTRACTOR RELATIONSHIP:** Manufacturer and OpticsPlanet acknowledge that with respect to all matters relating to this Agreement, parties shall be deemed to be Independent Contractors and each party shall bear its own expenses in connection with this Agreement. Neither party shall have authority, whether expressed or implied, to assume or create any obligation on behalf of the other party.

**11. FORCE MAJEURE:** Parties shall not be liable for any loss, damage, detention, delay or failure to perform in whole or in part, whether or not resulting from causes beyond either party's control, including, but not limited to, war, fires, strikes, inability to obtain supplies of raw materials, or requirements or regulations of the United States government, or any other applicable government or authority. It is understood that in no event shall either party be liable for consequential damages.

**12. NON-SOLICITATION:** Neither Party will solicit the other party's employees during the term of this Agreement.

**13. EXPENSES:** Each Party shall bear its own costs and expenses arising with respect to and in the performance of this Agreement. Neither Party shall be liable to the other under any circumstances (whether based in contract, in tort, including negligence and strict liability) or otherwise for any indirect or consequential loss or damage whatsoever, or loss of profit or revenue.

**14. NOTICES:** Any notice or other written communicated required or permitted to be given by this Agreement shall be deemed given when personally delivered or five (5) days after it has been sent by email to the addresses below.

**15. GOVERNING LAW AND FORUM:** This Agreement shall be deemed performed in and shall be governed by the laws of the State of Illinois. Each of the parties hereby irrevocably submits to the jurisdiction of the United States federal court or state courts sitting in Cook County, Illinois, in any action or proceeding arising from or relating to this Agreement, and each of the parties irrevocably agrees that all claims in respect of any such action or proceeding may be heard and determined in any such court and irrevocably waives any objection it may now or hereafter have as to the venue of

any such suit, action, or proceeding brought in such court or that such court is an inconvenient forum

**16. SEVERABILITY:** If any provision of this Agreement is determined to be invalid or unenforceable, the provision shall be deemed to be severable from the remainder of this Agreement and shall not cause the invalidity or unenforceability of the remainder of the Agreement.

**17. ASSIGNMENT:** The parties may not transfer or assign this Agreement or any part thereof with the other party's prior written approval. This Agreement shall be binding upon and shall inure to the benefit of each party and its respective successors and assigned.

**18. COUNTERPARTS:** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**19. CAPTIONS:** The captions of the sections and subsidiary sections of this Agreement are included for reference purposes only and are not intended to be a party of this Agreement or in any way to define, limit or describe the scope or intent of the particular provision to which they refer.

**Manufacturer acknowledges reading, understanding and agreeing to be bound by the terms and conditions herein. Each person executing this documenting warrants that he or she is authorized to do so by the party he or she represents.**

**Manufacturer:** PowerUp Inc. d/b/a PBTT **Address:** 5622 Vann Rd. Newburgh IN 47630

**Signed:** [signature] **Title** President **Date:** 10/14/2020

**Email:** AMDERO@PBTTCORP.com

**OpticsPlanet, Inc., 3150 Commercial Ave., Northbrook, Illinois 60062**

**Signed:** [signature] **Title** CEO **Date:** 10/15/2020

**Email:** info@OpticsPlanet.com

OPTICS PLANET INC.

**Exhibit A**

**Proprietary Products**

Firearm parts in quantities specified by OpticsPlanet, Inc.

OPTICS PLANET INC.

**Exhibit B**

**Trademarks and Trade Names**

**TRYBE and associated logos.**

# MUTUAL NONDISCLOSURE AGREEMENT

This Mutual Nondisclosure Agreement (the "Agreement") is entered into as of Oct 14, 2020 (the "Effective Date"), by and between OpticsPlanet, Inc., an Illinois corporation with offices at 3150 Commercial Ave., Northbrook, Illinois 60062, U.S.A. and its affiliates ("OpticsPlanet") and PowerUp Inc. d/b/a PBTT a(n) Indiana Corporation with offices at 5422 Vann Rd. Newburgh IN 47630 ("Company")

## TERMS

1. **Confidential Information.** For the purposes of this Agreement, "Confidential Information" shall include: (a) the existence, terms and conditions of this Agreement; and (b) any technical, operational, financial, business information whether in written, graphic, electromagnetic, verbal or other form (including but not limited to specifications, prototypes, software, models, drawings, techniques, methods, marketing plans, business opportunities, customer lists, personnel data, research and development activities, know-how, suppliers, finances, operations, sales plans, technology, product information, product specifications, trademarks, logo, and third party information), that (i) the disclosing party marks or otherwise designates as "Confidential" or "Proprietary" or the like, or (ii) would be considered a trade secret of the disclosing party under normal international trade practice, or (iii) should reasonably be (or have been) understood by the receiving party (because of legends, markings, the circumstances of disclosure or the nature of the information itself) to be proprietary and/or confidential to the disclosing party, an affiliate of the disclosing party or a third party.

Without limiting the generality of the foregoing, the Confidential Information to be disclosed under this Agreement shall specifically include (but is not limited to) prototypes, models, drawings, techniques, methods, marketing plans, business opportunities, customer lists, personnel data, research and development activities, know-how, suppliers, finances, operations, sales plans, technology, product information, product specifications, trademarks, logos, and third party information.

Confidential Information does not include information that is: (u) rightfully in the receiving party's possession before receipt from the disclosing party; (v) in the public domain without the fault of the receiving party; (w) received by the receiving party from a third party to the extent such third party permits use beyond the scope of this Agreement; (x) disclosed by the disclosing party to a third party without a duty of confidentiality; (y) independently developed by the receiving party; or (z) disclosed by the receiving party with the disclosing party's prior written consent.

2. **Limitation on Use.** The receiving party shall use the Confidential Information solely for its internal business purpose of evaluating a potential business relationship and performing any business relationship the parties may enter into ("Purpose"). Neither party shall copy Confidential Information of the other party except as necessary to accomplish the Purpose. Copies shall contain the same confidential or proprietary legends as the originals.

3. **Limitations on Disclosure.** The receiving party is only permitted to disclose the Confidential Information: (a) to those employees, agents, professional advisors and subcontractors who (i) have a need to know the Confidential Information, and (ii) are bound by confidentiality obligations at least as restrictive as those set forth in this Agreement; or (b) as may be required by law and compelled by an order issued by a court of competent jurisdiction, provided that the receiving party will provide the disclosing party with prompt advance written notice so that it may seek an appropriate protective order or reliable assurance that confidential treatment will be accorded all Confidential Information. The receiving party shall hold the Confidential Information in confidence and shall use the same degree of care that it uses to protect its own confidential information (but in no event less than a reasonable degree of care) to prevent unauthorized use or disclosure of the Confidential Information. The receiving party will be liable for all acts and omissions of its employees, agents and subcontractors regarding this Agreement.

4. **Duty to Return or Certify Destruction.** Within fifteen (15) business days after the expiration of the Disclosure Period (hereafter defined) or the request of the disclosing party (whichever occurs earlier), the receiving party shall return or certify the destruction of all Confidential Information that it received (and all copies, summaries and analyses thereof).

5. **Disclosure Period.** This Agreement shall cover all Confidential Information disclosed before and within three (3) years of the Effective Date (the "Disclosure Period").

6. **Confidentiality Period.** The receiving party's obligations under this Agreement will continue in full force and effect until five (5) years after the expiration of the Disclosure Period, except that the receiving party's obligations with respect to Confidential Information that is considered a trade secret of the disclosing party under normal international trade practice shall continue until such Confidential Information is no longer a trade secret.

7. **Warranty.** The disclosing party warrants that it has the right to make all disclosures made under this Agreement. NO OTHER WARRANTIES, EXPRESS OR IMPLIED, ARE MADE BY EITHER PARTY UNDER THIS AGREEMENT. ALL INFORMATION DISCLOSED UNDER THIS AGREEMENT IS PROVIDED "AS IS."

8. **Ownership.** The disclosing party shall retain all right, title and interest in and to its Confidential Information. The receiving party shall acquire no right, title, interest or license in or to the disclosing party's Confidential Information, except as expressly agreed by the parties in writing. Neither party shall reverse engineer, disassemble or decompile any prototypes, software or other tangible objects that embody the other party's Confidential Information, and that are provided to the party in accordance with this Agreement.

9. **No Further Obligation.** This Agreement shall neither impose nor be deemed to impose any obligation on either of the parties to: (a) purchase, sell, license, transfer, exchange or otherwise use any information, technology, products or services; (b) commence or continue any discussions or negotiations; (c) reach or execute any other agreement; (d) refrain from engaging in any business whatsoever; or (e) refrain from commencing or continuing any discussions, negotiations or agreements with any third party. Each party will be solely responsible for its own cost and expenses that are incurred in connection with this Agreement and the preparation of any written agreement relating to the subject matter hereof.

10. **Conformity with Applicable Law.** Each party shall fully comply with all applicable laws, regulations, executive orders and rules pertaining to the Confidential Information, including but not limited to those pertaining to insider trading and exportation.

11 **Publicity** Neither party shall use any trade name, service mark, or trademark of the other or refer to the other party in any promotional activity without obtaining the prior written consent of the other party as to each proposed usage, including the content thereof

12 **Notice** Any notice or other communication given by either party in connection with this Agreement shall be in writing to the addresses at the beginning of this Agreement and sent via first class mail (postage prepaid) or overnight courier or fax (with a hardcopy sent via one of the prior two mailing methods)

13 **Assignment** Neither party may assign this Agreement without having obtained the prior written consent of the other party

14 **Independent Contractor Relationship** This Agreement does not create any employment, agency or partnership relationship between the parties Each party is engaged in an independent business and will perform its obligations under this Agreement as an independent contractor

15 **Waiver** No failure or delay in exercising any right under this Agreement shall operate as a waiver of that right unless such waiver is set forth in writing and signed by the party against whom enforcement is sought

16 **Counterparts** This Agreement may be executed in any number of counterparts and each of such counterparts shall for all purposes constitute part of one original Facsimiles or electronic deliveries of the parties' signatures shall be binding as originals

17 **Governing Law** The internal, substantive laws of the State of Illinois of the United States of America shall govern all aspects of this Agreement. The parties shall submit all disputes which arise under this Agreement to state or federal courts located in the City of Chicago, Illinois, U S A for resolution The parties acknowledge that such courts shall have exclusive jurisdiction over this Agreement, and specifically waive any claims which they may have that involve jurisdiction or venue, including, but not limited to, *forum non conveniens*. Service of process for any claim which arises under this Agreement shall be valid if mailed to the party being served, by first class air mail, Federal Express, UPS, or another overnight carrier

18 **Remedies** Each party agrees that its obligations as set forth in this Agreement are necessary and reasonable in order to protect the disclosing party and its business interests. Each party agrees that monetary damages may be inadequate to compensate the disclosing party for any breach or threatened breach of this Agreement. Accordingly, each party agrees that any such breach or threatened breach may cause irreparable injury to the disclosing party and that, in addition to any other remedies that may be available at law or in equity, the disclosing party shall be entitled to seek injunctive relief against any threatened or continued breach of this Agreement without the necessity of proving actual damages

19 **Entire Agreement.** This Agreement, including its duly authorized and executed amendments and attachments, sets forth all of the promises, agreements and conditions regarding its subject matter, supersedes all prior understandings (whether written, oral or otherwise) pertaining thereto and constitutes the entire Agreement between OpticsPlanet and the Company regarding the subject matter hereof. If any term or condition of this Agreement is held to be illegal or unenforceable (in whole or in part) by a court of competent jurisdiction, then the legal and enforceable portion of such term or condition (and all remaining terms and conditions of this Agreement) will remain in full force and effect Any additions, amendments, attachments or modifications to this Agreement shall be made in writing and signed by both OpticsPlanet and the Company.

**Signatures:**

| OpticsPlanet, Inc. | COMPANY |
|---|---|
| Signature: [signature] | Signature: [signature] |
| Name: Mark Levitin | Name: Alexander M. Derderian |
| Title: CEO | Title: President |
| | Entity: PowerUp Inc. d/b/a PBTT |

OPTICS PLANET INC

[illegible]

As a vendor providing goods and/or services to OpticsPlanet, Inc. we require the entity identified below to provide evidence of current insurance in the form of a standard certificate of insurance. The certificate of insurance must specifically name OpticsPlanet, Inc. its subsidiaries, affiliates, or divisions as an additional insured, and this document serves as a written agreement evidencing this requirement. The certificates of insurance must remain current and any lapse in coverage may affect our ability to continue purchases from the entity identified below. Annual insurance renewal and evidence of coverage is a requirement of continuing as an approved vendor.

By signature below, the entity identified below agrees to these terms and conditions.

**Name of Company:** PowerUp Inc. d/b/a PBTT
Signature: [signature]
Name: Alexander M. Derderian
Title: President
Date: 10/15/2020

**OpticsPlanet, Inc.**
Signature: ______________________
Name: ______________________
Title: ______________________
Date: ______________________

# EXHIBIT B

Alexander Derderian
Office: 812.646.5765
Mobile: 810.965.3675
amderd@pbttcorp.com

PBTT

March 4, 2025

OpticsPlanet, Inc.
3150 Commercial Avenue
Northbrook, IL 60062
Attn: Alex Royzen, Managing Director
Email: Alex.Royzen@ecentria.com

***Re: Cease and Desist***

Dear Mr. Alex Royzen:

We are writing to address a matter of utmost importance regarding the unauthorized use of our federally registered trademark for Magnite, attached as Exhibit A (the "**Trademark**"). PBTT, Inc. ("**PBTT**") is the registered owner of the Trademark, which is protected under applicable intellectual property laws.

PBTT recently terminated OpticsPlanet's license and right to the use of the Trademark. Accordingly, Optics Planet is legally obligated to discontinue any use, marketing, packaging, and distribution of the Trademark.

It has come to our attention that OpticsPlanet is currently using PBTT's Trademark without authorization in connection with the unauthorized use, marketing, packaging, and distribution of the Trademark. This

unauthorized use constitutes a violation of PBTT's exclusive rights and is likely to cause confusion among consumers, thereby diluting the distinctiveness of our Trademark.

We hereby demand that OpticsPlanet immediately cease and desist from any and all use of PBTT's Trademark. This includes, but is not limited to, removing the Trademark from all products, marketing materials, and any other medium where the Trademark is currently being used without permission.

OpticsPlanet is required to comply with this demand no later than March 3, 2025. Failure to do so will leave PBTT with no choice but to pursue all available legal remedies, including, but not limited to seeking injunctive relief and monetary damages for trademark infringement.

We trust that OpticsPlanet, Inc. will recognize the seriousness of this matter and act accordingly to rectify this situation promptly. Should you have any questions or require further clarification, please do not hesitate to contact me. We look forward to your immediate compliance with this demand.

Very truly yours,

PBTT INC.

Alexander Derderian

# United States of America

## United States Patent and Trademark Office

# MAGNITE

**Reg. No. 7,374,878**

**Registered Apr. 30, 2024**

**Int. Cl.: 6**

**Trademark**

**Principal Register**

PBTT INC (MICHIGAN CORPORATION)
9393 Oakmont Drive
Grand Blanc, MICHIGAN 48439

CLASS 6: Alloys of common metal; Corrosion-resistant metal alloys for fittings, steel plates, flanges, piping components; Magnesium and its alloys; Metal alloys for further manufacturing; Metals and metal alloys; Non-ferrous metals and their alloys

FIRST USE 3-1-2020; IN COMMERCE 3-1-2020

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT STYLE, SIZE OR COLOR

SER. NO. 90-691,271, FILED 05-05-2021

Katherine Kelly Vidal

Director of the United States
Patent and Trademark Office

**REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

**Requirements in the First Ten Years***
**What and When to File:**

- ***First Filing Deadline:*** You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. See 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

- ***Second Filing Deadline:*** You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between the 9th and 10th years after the registration date.* See 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods***
**What and When to File:**

- You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.*

**Grace Period Filings***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

***ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the United States Patent and Trademark Office (USPTO). The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. See 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. See 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the USPTO website for further information. With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

**NOTE: A courtesy e-mail reminder of USPTO maintenance filing deadlines will be sent to trademark owners/holders who authorize e-mail communication and maintain a current e-mail address with the USPTO. To ensure that e-mail is authorized and your address is current, please use the Trademark Electronic Application System (TEAS) Correspondence Address and Change of Owner Address Forms available at** http://www.uspto.gov.

# EXHIBIT C

**From:** Alex Derderian
**To:** Alex Royzen
**Cc:** "Christina Singler"; ccdickpbttcorp@gmail.com; theghostridgegroup@gmail.com
**Subject:** RE: OpticsPlanet/TRYBE/PBTT Relationship
**Date:** Tuesday, March 4, 2025 5:26:01 PM
**Attachments:** image001.png
OpticsPlanet Cease and Desist Letter.pdf
004TUS1 Reg TM 4-30-24.pdf

*** CAUTION: This email originated from outside of Ecentria. DO NOT click any links or open any attachments, unless you recognize the sender and know the content is safe ***

Alex,

Thank you for your email. I understand your position. The following are open purchase orders with work in progress at our facility. You can elect to pay liquidation fees associated with that WIP or we can close the following contracts per the estimated dates listed below:

1. AR-15 Upper Receiver: PO 2849797
   a. Order Volume: 250
   b. Work in Progress: 207
      i. Estimated Fulfillment per Schedule: Ship week of 3/24/25
   c. Exit Cost Associated with WIP: $2,525.40 in lieu of taking additional production.
1. AR-15 Charging Handles: PO 2314227
   a. Order Volume: 5,036
   b. Work In Progress: 1,331
      i. Estimated Fulfillment per Schedule: Ship week of 4/14/25
   c. Exit Cost Associated with WIP: $13,669.37 in lieu of taking additional production.
2. AR-10 Charging Handles: PO 2484933 and PO2956561
   a. Order Volume: 300
   b. Work In Progress: 124
      i. Estimated Fulfillment per Schedule: Ship week of 3/17/25
   c. Exit Cost Associated with WIP: $716.72 in lieu of taking additional production.

PBTT will agree to cancel purchase orders associated with the Eastern Block Rail System (PO 2848903), Picatinny Rails (PO 2861679), and Steel Barrel Nuts (PO 2998977) at no additional cost to OpticsPlanet if you agree to either accept work in progress for the aforementioned POs or pay liquidation fees associated with that WIP as listed above within the next 10 calendar days.

Additionally, PBTT made a formal request for OpticsPlanet to cease the use of its federal trademark this last January. I have attached the formal cease and desist reflecting that request. As of today, March 4th, 2025, Magnite is still being publicly used by OpticsPlanet. If OpticsPlanet does not immediately cease use of the Magnite Trademark, PBTT must pursue legal action in the form of a temporary restraining order seeking permanent injunctive relief as well as monetary damages.

I've enjoyed our relationship and have appreciated your support. Let me know if you are willing to agree to either of the options detailed herein.

Alex Derderian
CEO
PBTT CORPORATION
Office: 812-646-5765
E-mail: AMDerd@PBTTCorp.com
Website: www.PBTTCorp.com

This e-mail and its contents, including any attached files, is the property of PBTT, and as such may be legally privileged and is solely for the intended recipient(s). If you receive this e-mail in error, please destroy it and notify the sender immediately by reply or phone. Any unauthorized use, dissemination, disclosure, copying or printing of this e-mail, or any attached file, without the permission of PBTT is strictly prohibited. The contents of this transmission are confidential.

---

**From:** Alex Royzen <Alex.Royzen@ecentria.com>
**Sent:** Monday, February 17, 2025 11:18 AM
**To:** Alex Derderian <amderd@pbttcorp.com>; theghostridgegroup@gmail.com; ccdickpbttcorp@gmail.com
**Subject:** OpticsPlanet/TRYBE/PBTT Relationship

Gentlemen,

Considering recent events regarding the Magnite trademark, OpticsPlanet/TRYBE is going to be discontinuing our OEM relationship with PBTT.

All open purchase orders will be cancelled (approx. $154K) unless there is immediate product ready to be shipped by EOD 2/21/25.

Thank you for your partnership over the last few years and we wish you nothing but success in the future.

**Alex Royzen** | Managing Director
Head of Merchandising and Supply Chain Management | **Ecentria**
Alex.Royzen@ecentria.com | (847) 513-6201 x1908 | www.ecentria.com

OpticsPlanet | CampSaver | USIQ

NOTICE: Information contained in this communication may be confidential, proprietary, and/or privileged. Any dissemination, distribution, printing, or copying of this communication by persons or entities other than the intended recipient is strictly prohibited. If you have received this communication in error, please notify the sender immediately by replying to the message and deleting the material from your computer. Please visit www.Ecentria.com/notices.html for other important information concerning this message and U.S. export laws related to our products.